FILED
2011 Jan-31  PM 04:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHERRY M. HILYER,** | ) | |
| **PLAINTIFF,** | ) | |
| **VS.** | ) | **2:09-cv-00843-JHH** |
| **HARTFORD LIFE AND ACCIDENT** | ) | |
| **INSURANCE COMPANY,** | | |
| | ) | |
| **DEFENDANT.** | | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

The court has before it Hartford Life and Accident Insurance Company's ("Hartford") Motion for Summary Judgment (doc. # 21), filed on May 19, 2010. Pursuant to the court's order of May 20, 2010 (doc. # 26), the motion for summary judgment is now under submission.

Sherry M. Hilyer ("Hilyer") filed her Complaint in this court on April 29, 2009, seeking reinstatement of her long term disability benefits. (Compl. at ¶¶ 18; 22). After portions of the complaint were dismissed, plaintiff was left with her federal claim under ERISA. (Doc. # 14).

On May 19, 2010, Hartford filed its memorandum of law (doc. # 22) and

evidence[1] (docs. # 23-25) in support of summary judgment, generally asserting that

Hartford's decision to deny Hilyer's long term disability benefits was not only legally

correct, but also that it was not arbitrary and capricious.  (Doc. # 22 at 29).  On June

21, 2010, plaintiff filed a Response (doc. # 32) to Hartford's Motion for Summary

Judgment.[2]  Plaintiff's brief generally alleges that Hartford wrongly denied her long

term disability benefits and that the decision to do so was unreasonable. (Doc. # 32

at 2).

In addressing the motion for summary judgment (doc. # 21), this court must

determine which standard of review applies and decide whether plaintiff is entitled

to ERISA benefits as a matter of law.[3]  As discussed more fully below, the court finds

that Hartford's motion for summary judgment (doc. # 21) is due to be granted.

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

---

[1] Hartford submitted: the declaration of Corey Welch, the administrative record, and
Thomas v. Hartford Life and Accident Ins. Co., No. 1:09-CV-0877-CC (N.D. Ga March 29,
2010).

[2] Hilyer relied on the evidence submitted by Hartford as if she offered the same in support
of her opposition.

[3] Because the court's role in ERISA cases is more akin to an appellate one, the scope of
its review on summary judgment is notably different than when it sits as a trial court.  See
Providence v. Hartford Life & Accident Ins. Co., 357 F. Supp.2d 1341, 1342 n. 1 (M.D. Fla.
2005) (finding that the court's task is to review the benefit decision based on the administrative
record available to the decision maker at the time he or she made the decision).

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

3

## III.   STATEMENT OF FACTS[4]

### A.   Introduction

Sherry Hilyer was employed at Superior Bank from August 29, 2005 until July 20, 2007. (Administrative Record ["AR"] at Hartford/Hilyer ["HH"] 0636). After leaving Superior, Hilyer applied for long term disability ("LTD") benefits, which Superior provided through Hartford, Policy No. GLT 852413 (hereinafter the "Policy"). (AR at HH 0001-61). On January 10, 2008, Hilyer's application for LTD benefits was approved and she received benefits for the period between November 17, 2007, and June 17, 2008. (AR at HH 0091-94; 0079-84). On June 17, 2008, Plaintiff was notified that as of that day, she no was longer Disabled as defined by the Policy. (AR at HH 0079-84). On July 14, 2008, Hilyer's attorney notified Hartford that the decision was being appealed . (AR at HH 0334). After considering the record on appeal, Hartford affirmed the determination that Plaintiff did not meet the Policy definition of disabled. (AR at HH 0067). On April 29, 2009, Hilyer filed the current lawsuit seeking reinstatement of her LTD benefits. (Compl. at ¶¶ 18; 22).

---

[4] These are the facts for summary judgment purposes only; they may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (internal citation omitted).

4

**B.     Policy Provisions**

Under the Policy, a person is eligible for LTD benefits if: "1. [they] become Disabled while insured under this plan; 2. [they] are Disabled throughout the Elimination Period; 3. [they] remain Disabled beyond the Elimination Period; 4. [they] are, and have been during the Elimination Period, under the Regular Care of a Physician; and 5. [they] submit Proof of Loss satisfactory to [Hartford]." (AR at HH 0020).  The term "Disability or Disabled" is defined in the Policy as follows:

> Disability or Disabled means:
> 1.     that during the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation;
> 2.     for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are less than 80% of your Indexed Pre-disability Earnings;
> 3.     after that, you are prevented from performing one or more of the Essential Duties of Any Occupation.
>
> If at the end of the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation, but your Current Monthly Earnings are greater than 80% of your Pre-disability Earning, your Elimination Period will be extended for a total period of 12 months from the original Date of Disability, or until such time as your Current Monthly Earnings are less than 80% of your Pre-disability Earnings, whichever occurs first.
>
> Your Disability must be the result of:
> 1.     accidental bodily injury;
> 2.     sickness;
> 3.     Mental Illness;

> 4.    Substance Abuse; or
> 5.    pregnancy.
>
> Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation, alone, does not mean that you are Disabled.

(AR at HH 0032).  "Your Occupation" is defined as "your occupation as it is recognized in the general workplace.  Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location." (AR at HH 0035).

If the claimant is found to be Disabled under the terms of the Policy, it is her responsibility to provide ongoing proof of disability or the benefits will terminate. The Policy states, in relevant part: "We will terminate benefit payments on the first to occur of 1. the date you are no longer disabled as defined [or] 2. the date you fail to furnish Proof of Loss, when requested by us." (AR at HH 0021).

Finally, the Policy vests Hartford with full discretionary authority to construe and interpret the terms of the Policy and determine eligibility for benefits thereunder. (AR at HH 0031) ("We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.").

**C.   Initial Approval and Medical History**

Plaintiff was employed by Superior as an Employment Administrator when she ceased work on July 20, 2007, due to complaints of chronic and severe pelvic pain. (AR at HH 0063).  On October 19, 2007, Hilyer applied for LTD Benefits pursuant to the policy of insurance issued to her by Hartford.[5]  (AR at HH 0063).   In determining whether Hilyer's application for LTD benefits should be approved, Defendant reviewed medical records and reports from Doctors Scott Kelley, Lewis Fowlkes, James Beretta, and Michael Gibson.

In 2000, Plaintiff began treatment for pelvic pain, pelvic infections, and pelvic inflammatory disease. (AR at HH 1000).  Between November 2002 and February

---

[5] Plaintiff's Response addresses the fact that her application for LTD benefits was approved 78 days after she submitted the application.  (Doc. # 32 at 2-3).  However, the policy provides that

> The Insurance Company will make a decision no more than 45 days after <u>receipt</u> of your properly filed claim.  The time for decision may be extended for two additional 30 day periods provided that, prior to any extension period, the Insurance Company notifies you in writing that an extension is necessary due to matters beyond the control of the Plain, identifies those matters and gives you the date by which it expects to render its decision.

(AR at HH 0059) (emphasis added).  Hartford properly notified Hilyer by a letter dated December 27, 2007, that it was exercising its right for a 30-day extension. (AR at HH 0099). Accordingly, Hartford had 75 days to notify Plaintiff of its decision with regards to her application.  While Hilyer correctly points out that she submitted her application on October 19, 2007, the earliest indication that Hartford was in receipt of the application came on November 13, 2007, when a Hartford employee e-mailed Hilyer's employer saying "we received the LTD application for Sherry Hilyer today." (AR at HH 0108).  Thus, Defendant made its decision concerning Plaintiff's LTD well within the required time limit under the Policy.

2005, Plaintiff was frequently seen by her gynecologist, Dr. Fowlkes, for complaints of pelvic pain. (AR at HH 0755-0807).  During that same period she was hospitalized at least six times for treatment of pelvic inflammatory disease. (Id.)  On September 9, 2004, in an effort to exhaust her options for pain relief before undergoing a hysterectomy, Plaintiff began to see Dr. Michael Gibson at the Birmingham Pain Clinic. (AR at HH 0820).  Dr. Gibson noted that Plaintiff suffered from "[a]bdominal/pelvic pain secondary to endometriosis, pelvic adhesions and history of pelvic inflammatory disease." (AR at HH 0821).  Dr. Gibson increased her dosage of Lortab. (AR at HH 0821).  On October 21, 2004, Plaintiff underwent a fluoroscopically guided pulsed radiofrequency lesioning of the right and left S2 segmental nerves. (AR at HH 0850).  The procedure resulted in a 10-20% relief of Hilyer's pelvic pain. (AR at HH 0854).  On February 3, 2005, Plaintiff underwent the same procedure again, except this time the lesioning was of the left and right S2, S3, and S4 segmental nerves. (AR at HH 0863-64; 0868).  This procedure resulted in relief of 75% of Plaintiff's pain. (AR at HH 0863-64; 0868).

Two weeks later, on February 12, 2005, Plaintiff had a total hysterectomy with no complications. (AR at HH 0679).  A surgical pathology report from Plaintiff's hysterectomy, dated February 15, 2005, indicated apparent endometrial polyps but concluded that Plaintiff's serosa is "free of endometriosis." (AR at HH 0683).

Plaintiff continued to see Dr. Gibson and undergo fluoroscopically guided pulsed radiofrequency lesioning after her hysterectomy.  The procedure was performed on September 13, 2005, February 14, 2006, May 30, 2006, May 22, 2007, and August 28, 2007. (AR at HH 0820-0969).

On July 23, 2007, three days after her last day of work, Plaintiff had an appointment at Birmingham Pain Clinic.  During that visit, she stated that her pain was mostly controlled. (AR at HH 0953).  She also stated that she was unable to take Percocet at work because "it makes her feel sedated at times" and that she was having "great difficulty working." (AR at HH 0954).  Dr. Gibson added Duragesic to Plaintiff's prescription regiment. (AR at HH 0954).  At her follow-up appointment on August 9, 2007, Plaintiff noted that her activity level had greatly improved as a result of treatment and that her pain was mostly controlled. (AR at HH 0957).  This was the last office visit contained in the records supplied by Birmingham Pain Clinic to Hartford.[6]   At the time of the initial approval of Plaintiff's LTD benefits, the doctor-patient relationship between Dr. Gibson and Hilyer had been terminated. (AR at HH 0125).

On August 31, 2007, Plaintiff saw Dr. Kelley, an internist, for the first time.

---

[6] There are records concerning the fluoroscopically guided pulsed radiofrequency lesioning that was performed on August 28, 2007. (AR at HH 0960-68).  However, these records do not contain information regarding the effect of Plaintiff's ongoing treatment had on her pain.

(AR at HH 0711).  During that visit, Plaintiff complained of nausea and addiction issues. (AR at HH 0716).  Dr. Kelley prescribed Suboxone therapy. (AR at HH 0716). During the follow up visit on September 5, 2007, Plaintiff complained of nausea, back pain, and trouble sleeping. (AR at HH 0718).  On September 12 and 17, 2007, Plaintiff was again treated by Dr. Kelley for chronic pain. (AR at HH 719-20).  On October 4, 2007, Plaintiff was treated by Dr. Kelley for nausea and vomiting. (AR at HH 0722).  She was given IV fluids, Toradol, and a lumbar injection. (AR at HH 0721-22).  At her follow-up visit on October 18, 2007, Plaintiff stated that she felt a lot better and that the "shot helped." (AR at HH 0723).  On that same day, Dr. Kelley signed the Attending Physician's Statement of Disability section of Plaintiff's application for LTD Benefits. (AR at HH 0724).  Dr. Kelley noted that Plaintiff's progress was unchanged.  He further noted that Plaintiff's chronic pain prevents average prolonged use of her lower back. (AR at HH 0724-25).  He also stated that Plaintiff is unable to drive or use the keyboard because of medication. (AR at HH 0725).  Finally, Dr. Kelley noted that he was unsure how long Plaintiff's limitations would last. (AR at HH 0725).

On September 27, 2007, Dr. Fowlkes completed the Attending Physician's section of Plaintiff's application for LTD benefits. (AR at HH 1000).  On the application Dr. Fowlkes stated that the primary diagnosis was chronic pelvic pain.

10

(AR at HH 1000).   He wrote "N/A" in the section seeking information about Plaintiff's limitations and indicated that Plaintiff had a "[m]oderate impairment in occupational functioning." (AR at HH 1001).  In other words, he found that Plaintiff was "[l]imited in performing some occupational duties."  (AR at HH 1001).  Dr. Fowlkes noted that he did not know how long the limitations would last.  (AR at HH 1001).

On October 16, 2007, Plaintiff saw Dr. Beretta, a pain management doctor, for the first time.  (AR at HH 0555).  Dr. Beretta's records are, for the most part, unintelligible, however the following is what can be gleaned from the legible portions. (AR at HH 0124; 0551-55).  During Plaintiff's visit on October 16, 2007, Dr. Beretta noted that Plaintiff complained of chronic pelvic pain. (AR at HH 0555). He prescribed Lyrica and Percocet. (Id.) Dr. Beretta's notes on November 15, 2007, and December 13, 2007, report similar facts . (AR at HH 0554-53).

On January 10, 2008, Hartford made the decision to approve Plaintiff's LTD benefits based on Plaintiff's medical history.  (AR at HH 0123-25).  The entry in Defendant's records dealing with the approval recommendation notes that it reviewed Dr. Kelley's Attending Physician Statement, dated October 18, 2007, and medical

records from Dr. Kelley, Dr. Fowlkes, Dr. Beretta, and Dr. Gibson.[7] (AR at HH 0124).   Defendant's records also note that when Plaintiff was interviewed, she indicated that at the time she left work, she felt the pain medication was making it difficult to function, but was not decreasing her pain.   (AR at HH 0125).   The approval entry noted concern that the records did not clearly indicate whether Hilyer had experienced a change in her symptoms when she decided to leave work. (Id.) Defendant's records further recommended follow up medical updates from Dr. Kelley and Dr. Beretta in three months and, if there is no change in symptoms at that time, an independent medical review. (Id.)

Hilyer was notified by Jennifer Circeo of Hartford that her application for LTD Benefits had been approved. (AR at HH 0123).   During this phone call, Hilyer was informed of the ongoing proof of disability requirements and advised that Hartford

---

[7] On February 7, 2008, Hartford received a response from Dr. Kelley to a questionnaire it had sent the previous month. (AR at HH 0121). When asked what the clinical exam findings were to indicate the present severity of pelvic adhesions and endometriosis in Plaintiff, Dr. Kelley responded that there was severe lower right quadrant pain and pain in the right lower back that radiates down the hip. (AR at HH 0621).  He also stated that it was difficult to determine the extent of the endometriosis and that the adhesions were probably worse given that they were created from surgery. (Id.)  He added that the total hysterectomy initially helped the pain, but now the pain was such that Plaintiff is unable to "bend/stoop/sit/walk." (Id.)  He stated that Plaintiff's need for suboxone therapy does not indicate an addiction issue, but rather a tolerance that requires a different medication for a period of time. (Id.) Finally, when asked if Plaintiff's pain is proportional to the evidence of pain, Dr. Kelley responded that Plaintiff's level of pain was appropriate for combined radiculopathy and adhesions. (Id.)  The additional information provided by Dr. Kelley in his responses did not affect Hartford's decision to approve Hilyer's LTD benefits. (AR at HH 0121).

"would likely be updat[ing] her medical records in [three] mo[nth]s to determine her progress." (AR at HH 0253).

**D.    Defendant's Decision to Review and Ultimately Deny Plaintiff's Claim**

On February 4, 2008, Hartford's records indicate that it began to review Plaintiff's file further. (AR at HH 0121-22).  At that time, Plaintiff was not deemed appropriate for rehabilitation services and the file was returned for possible non-medical referral. (Id.)  On February 12, 2008, the claim was referred to and accepted for investigation. (AR at HH 0118; 0249).  The following day, Hartford requested that John Welch conduct surveillance to establish Plaintiff's level of activity. (AR at HH 0495).  On March 11, 2008, the file was referred for an in-person interview. (AR at HH 0248).  On April 11, 2008, Hartford requested medical records from Birmingham OBGYN, Dr. Fowlkes, and Dr. Kelley. (AR at HH 0248.)  During the April 24, 2008, interview, Plaintiff provided medical records from Dr. Beretta for the time period from January 15, 2008 to April 15, 2008.  (AR at HH 117).  On May 2, 2008, Hartford received an occupational analysis report. (AR at HH 0116)

**1.    Video Surveillance**[8]

On February 12, 2008, Hartford reviewed Plaintiff's file and requested

---

[8] This court has independently viewed the surveillance video and bases its factual findings on that viewing.

13

surveillance in order to establish Plaintiff's level of activity. (AR at HH 0495).  An investigator for Hartford conducted video surveillance of Plaintiff on Thursday February 28, 2008, and Friday, February 29, 2008. (AR at HH 0496; 0975-87; Video). The following is a brief recitation of what occurred on the approximately two hours of surveillance video.

The video depicting the events of February 28, 2008, begins with a shot of Plaintiff's home at 5:57 a.m.. (AR at Disk 1).  At 10:57 a.m., Plaintiff walks from her front door to retrieve her mail. (Id.) She appears to walk without pain to and from the mailbox and does not use assistance of the railing when using the stairs to and from her front door. (Id.) At 10:59 a.m., she drives away from her house. (Id.).  She arrives at a different house at 11:08 a.m.. (Id.)  At 3:08 p.m., Hilyer walks to her car without any apparent discomfort and drives to a third house. (Id.)  She arrives at the new location at 3:26 p.m. and stays there for thirteen minutes before she and her friend get in Hilyer's car and Plaintiff drives away. (Id.)  Plaintiff arrives at the post office at 3:47 p.m. and continues on to a restaurant where she arrives at 3:53 p.m.. (Id.) There is no video footage from 3:54 p.m. until 4:00 p.m.. (Id.)

The footage resumes with Plaintiff and her friend sitting at a table in an unnamed restaurant. (Id.) Plaintiff and her friend stay at the restaurant until 5:36 p.m. (1 hour and 36 minutes). (AR at Disks 1-3). The video does not capture Plaintiff's

activity between 4:36 p.m. and 4:43 p.m., and 5:06 p.m. and 5:14 p.m.. (<u>Id.</u>)

Otherwise, Plaintiff is shown sitting at the table, eating, and talking to her friend, all

without any apparent discomfort.[9] (<u>Id.</u>)   Throughout the course of the meal Plaintiff

is seen moving her arms around, twisting around in her chair,[10] and getting up

(presumably to use the restroom), all without any visible signs of pain or distress.

(<u>Id.</u>)  With regards to Plaintiff getting up out of her chair, she got up and walked away

from the table (again, presumably to go to the restroom) at least twice, once at 5:00

p.m. and again at 5:32 p.m.. (AR at Disk 2-3).  At 5:36 p.m., Plaintiff gets up from her

chair, puts on her coat, and leaves the restaurant. (AR at Disk 3). Plaintiff and her

friend both get into Plaintiff's car and pull out of the parking space at 5:38 p.m.. (<u>Id.</u>)

The final piece of video from February 28, 2008, shows Plaintiff's house at 7:00 p.m..

(<u>Id.</u>) At that time the upstairs lights inside Plaintiff's home are on. (<u>Id.</u>)

On February 29, 2008, Plaintiff leaves the house at 12:02 p.m. to get the mail.

---

[9] In addition to eating and conversing with her friend, Plaintiff also appears to drink two beers over the course of the approximately ninety-minute meal. Because this court cannot be certain that the beverage in question contained alcohol, this fact does not factor into its decision. However, if the court could be certain of the alcohol content of the drinks, the decision to drink two beers and then drive while presumably on pain medication might cast doubt on Plaintiff's claims relating to an inability to work based on her reaction to those same prescription pain medications.

[10] Plaintiff is seen twisting around in her chair in what seems to be an attempt to see something out the window.  This is evidenced by the fact that when she twists around to look in the other direction her dinner companion also focuses her attention in the same direction. She does this at least five times between 4:43 p.m. and 5:00 p.m..

(Id.) She is wearing slippers and loungewear type clothing. (Id.) At 12:51 p.m., Plaintiff drives away from her house. (Id.) At 12:56 p.m., she arrives at a restaurant where she has lunch with a friend. (Id.) There is no footage from 12:56 p.m. to 1:24 p.m.. (Id.) From 1:24 p.m. to 1:36 p.m., the video depicts Plaintiff eating lunch. (AR at Disk 3-4).  At 1:37 p.m., Plaintiff and her friend leave the restaurant. (AR at Disk 4.) The video resumes at 1:48 p.m. with Plaintiff sitting in her car in a parking lot outside of a store. (Id.) Plaintiff remains in her car until 1:57 p.m. when she exits the car and walks into a store. (Id.) The footage resumes at 2:07 p.m. and shows Plaintiff shopping with a friend. (Id.) While shopping Plaintiff bends over to look at items, reaches for items, and appears to walk without any problem. (Id.) At 2:19 p.m., she exits the store and she and her friend get into Plaintiff's car and leave the parking lot. (Id.) At 2:36 p.m., they arrive at a different location and walk inside.  (Id.)  At 3:34 p.m. the video resumes with Plaintiff sitting in her car with a friend in a parking lot. After getting out of her car and walking to her friend's car, she returns to her car and drives away. The last few seconds of footage depict Plaintiff's house at 4:00 p.m.. (Id.)

Throughout the video footage Plaintiff does not appear to have problems walking, getting in and out of her car, sitting while eating meals, bending, twisting, or reaching.

## 2.      In-person Interview

On March 31, 2008, Jack Welch,[11] who identified himself as an employee of Hartford, sent Plaintiff a letter requesting to schedule a "very informal" interview to address a number of formatted questions regarding her LTD claim. (AR at HH 1051). On April 24, 2008, Hartford conducted an in-person interview with Plaintiff at her home. (AR at HH 1058-68).  During the interview, Plaintiff was shown portions of the above-mentioned surveillance video, was asked questions related to her LTD claim, and signed a statement regarding her disability. (Id.)

The report of the interview states that Hilyer identified herself as the female depicted in the surveillance footage. (AR at HH 1058).  Plaintiff stated that the activities depicted on film represented her normal or average level of functionality. (Id.)

During the three-hour interview, the investigator took note of Plaintiff's comments and observed her movements. (AR at HH 1058-68).  Throughout the interview Plaintiff wore her pajamas and a bathrobe. (AR at HH 1059).  She acknowledged this fact and apologized that she had not gotten dressed yet. (Id.)

---

[11] The letters sent to Plaintiff concerning the interview are signed "Jack Welch." (AR at HH 1051).  However the information in the record states that the file has been assigned to "John Welch." (AR at HH 0495).  The court assumes that Jack Welch and John Welch are one and the same.

Plaintiff's demeanor during the interview was "pleasant, cooperative, and polite." (Id.) However, she was "visibly upset for much of the start of the interview as she discussed how her life has changed since the onset of her disability and the fact she was forced to sell her home . . . due to the fact that she cannot maintain it any longer." (Id.) Plaintiff also indicated that she was not pleased with Hartford due to past delays in receiving her disability checks. (Id.)

The investigator observed that Plaintiff was able to walk "without any noticeable limitations or restrictions" and that she "did not display any type of pain indicators while walking through her home." (Id.) Further, Plaintiff sat on a wood dining-room chair for approximately 20-30 minutes at a time; although, she did appear to "shift around in her seat and change positions often." (Id.) Plaintiff appeared to have "normal/average reaching abilities during the course of the interview." (Id.) During the interview the investigator "did not observe any type of cognitive or concentration type issues." (AR at HH 1060). However, Plaintiff did state that she was "concerned about her mental status; although she stated she has not been formally diagnosed with depression some of her medications help maintain some judgment." (Id.) The investigator found that Plaintiff possessed the ability "to communicate, understand questions and instructions, and articulate answers." (Id.)

During the interview, Plaintiff signed a Continuing Disability Statement stating

18

that she suffered from constant dull aching pain throughout her pelvic area and that the pain was more prevalent on her right side. She stated that at times the pain "has been so severe that [she is] unable to even get out of bed." (Id.) According to Plaintiff, this happens twice a month on average. (Id.) Hilyer stated that she is "limited physically in terms of walking, standing, sitting, lifting and carrying due to the constant pelvic pain." (Id.) She also stated that the prescription medication that she was taking at the time "may prohibit [her] from returning to [her] job or any other occupation." (Id.)

With regards to current treatments, Plaintiff stated that she was not involved in any formal treatments or therapy-type programs, but that her doctor had encouraged her to walk. (AR at HH 1062). She reported that she had not had enough good days recently to even consider walking and that the last time she was able to take a walk had been a month before the interview. (Id.)

With regards to her limitations at the time of the interview Plaintiff reported that she was able to walk a maximum of "20 to 30 minutes before [she] needs to stop and rest." (Id.) When she has walked her maximum time limit, she will need to stop and sit or lay down because of the increased pain in her pelvic area. (Id.) She is able to walk long enough to take care of daily activities such as running errands and going to appointments. (Id.) Plaintiff is able to shop for a maximum of "20 to 30 minutes",

19

but if she exceeds this time shopping she will start to have increased pain in her pelvic area "and need to get off [her] feet for a while." (Id.)  She is able to stand for 10 to 15 minutes, but after this maximum time she needs to shift positions or sit down because of the pain in her pelvic area. (Id.) Plaintiff reports that she is able to carry a maximum of 10 to 12 pounds and that additional weight causes an increase of pain. (Id.)  She further reports that she is able to bend forward (not repetitively); twist at the waist; squat to sit in a chair, on a toilet, or to the floor (she sometimes has to hold onto something for additional support); kneel on the ground (would need assistance getting up); push and pull something that offers light to moderate resistance; reach without restriction; and keep her balance. (Id.)  Plaintiff is also able to walk up and down stairs, but is not able to do so repetitively. (Id.)  When she walks up and down stairs she has to do so at an average pace, taking one stair at a time, and using the railing. Using stairs increases her pain level to a 7 or 8 in her pelvis. (Id.)

Plaintiff has full use of her hands and is able to write or type for as long as she is able to sit, which is for a maximum time of 30 to 45 minutes. (AR at HH 1063-64). If she were to sit for longer than the maximum time limits, she would experience a pain level of 8. (AR at HH 1064). Plaintiff is able to concentrate provided that she is not in too much pain or discomfort. (Id.)  She is only able to sleep 4 to 6 hours a night because of her pelvic pain. (Id.)  During the night, Plaintiff tends to wake up, leaving

20

her feeling fatigued during the day. (Id.)  She naps occasionally. (Id.)  Plaintiff is able

to drive a maximum of 30 to 45 minutes before she has to get out of the car, stretch,

and change positions due to increased pelvic pain. (Id.)  She is able to drive to take

care of her daily appointments and any errands that she might have. (Id.)  According

to Plaintiff, her driving "is more limited by the prescription medications [she takes]

and the pelvic pain." (Id.)

> Plaintiff describes a typical day as follows:
>
>> On a typical day I get up around 8:30 or 9:00 a.m. have some
>> breakfast and then watch some TV or make phone calls.  I may meet my
>> girlfriend or she may come by and pick me up and we will usually go to
>> lunch.  After lunch I will go back home and rest for a while and watch
>> some more TV.  In the evening I will make myself something for dinner,
>> and then clean up and watch some more TV or read a while.  I normally
>> go to bed around 9:00 p.m.

(AR at HH 1065).  During the last six months, Plaintiffs condition has remained the

same and she has not experienced a time when she could exceed the level or

functionality or be more active than she described above. (Id.)  Plaintiff reported that

she was able to do the following activities: "watch TV, read, light cooking, loading

and unloading the dishwasher, laundry, wiping off counters, make my bed, talk on the

phone and general straightening up." (Id.)  The outside activities that Plaintiff was

able to do included "attending] doctor's appointments, light shopping, sitting] around

with [her] dog Lucy, taking] occasional walks, getting] the mail, occasionally

visiting] friends and family, and attending] church services." (Id.) Plaintiff stated that there "are no accommodations that can be made which would allow me to return to work with my current medical condition." (Id.)

During the interview Plaintiff also signed a Second Statement of Continuing Disability. (AR at HH 1067).  In the second statement she reaffirmed that the activities documented in the surveillance video represent her normal or average level of functionality during her daily activities. (Id.) She also stated that while Dr. Kelley and Dr. Fowlkes had filled out Attending Physician's Statements of Continuing Disability, one stating that "standing, walking, lifting, carrying, reaching, pulling and pushing are all prevented with prolonged use of lower back" and the other reporting "N/A", that Plaintiff's actual restrictions and limitations are best represented by her first statement of continuing disability taken earlier in the interview.

### 3.   Additional Medical Records and Responses from Treating Physicians

On review, Hartford received medical records from Dr. Beretta (January 15, 2008, to April 15, 2008) and from Dr. Kelley (January 8, 2008, to April 9, 2008). (AR at HH 0111).  Dr. Fowlkes' records were current through September 27, 2007. (Id.) As with the record received from Dr. Beretta earlier, his new records are very difficult to read, but appear to state that Plaintiff complains of chronic pelvic pain. (AR at HH

0549-52).  During Hilyer's visit on February 14, 2008, she complained of increased

pain over the weekend and on April 15, 2008, she complained of increased pain over

the past two days. (Id.)  Dr. Kelley saw Hilyer four times between January 2008 and

April 2008. (AR at HH 1013-16). His records do not contain anything remarkable

except that Hilyer continued to be in pain and had increased pain with her periods.

(Id.)

     In addition to the medical records, Hartford also notified Hilyer's doctors

informing them of the results of the activity check and interview[12] and asked them to

respond to three questions: whether Plaintiff has the ability to perform the physical

demands of her full time sedentary occupation; whether they recommended any

additional restrictions or limitations; and why they thought Hilyer was unable to

perform the physical demands of her occupation, if that was their opinion.  (AR at HH

0527-30; 0533-34).  Both Dr. Fowlkes and Dr. Beretta indicated that they thought

Plaintiff was capable of performing the physical demands of her full time sedentary

occupation. (AR at HH 0527-30).  Dr. Fowlkes stated that he did not recommend any

additional limitations or restrictions for Hilyer. (AR at HH 0528).  While it is difficult

---

[12] Plaintiff contends that the description of the surveillance tape contained in the letters to Doctors Fowlkes and Beretta does not accurately represent Plaintiffs actual activities during the activity check.  This court has watched the surveillance video and is aware of what it does and does not show.  The court will address in a later section the relevance of any differences.

to decipher Dr. Beretta's response to the second question, he appears to say "agree with those self-imposed and stated in this report." (AR at HH 0530).  Neither Doctor answered the third question.[13]

Dr. Chandler, one of Plaintiff's new physicians, did not respond to the initial request; however, he did respond when Hartford sent him copies of Doctors Fowlkes and Beretta's responses and asked whether he agreed with their finding that Plaintiff was capable of performing the functional duties of her sedentary occupation. (AR at HH 0512).  On June 12, 2008, Stephanie from Dr. Chandler's office called Hartford and stated that the doctor had no comment because he only treated Hilyer once and that he would return the fax with no comment because he did not know how to reply. (AR at HH 0112).  However, when the fax was returned, the box indicating that he did not agree with the other doctors' assessments that Plaintiff was capable of working was checked.  However, on the follow-up question asking him to explain, he stated that he had no comment because he only saw the patient one time on May

_____

[13] There is a discrepancy between the two copies of the responses from Dr. Fowlkes and Dr. Beretta. In one copy of both responses question 3 is left blank, while in the copy of the responses sent to Dr. Chandler, no comment is written by question 3.  Plaintiff argues that this alteration is "nefarious".  However, the more likely explanation is that someone at Hartford added the "no comment" to indicate that question 3 was left blank. This is especially true when considering that a response to question 3 would only be appropriate if question 1 was answered in the negative (question 1 asks whether the doctors think Plaintiff is able to perform the functional duties of her job and question 3 asks "If you do not feel Ms. Hilyer is capable of performing her full time occupation then please explain in detail").  Compare (AR at HH 0527-30) with (AR at HH 0513-15).

17, 2008, for a check-up. (AR at HH 0512).

### 4.     Occupational Analysis Report and Decision Denying Benefits

On May 5, 2008, Hartford received an occupational analysis report "comparing the essential duties, physical demands, environmental conditions and non-exceptional requirements of the [employee's] own occupation/employer of Employment Administrator at Superior Bank to the [employee's] own occupation/national economy of Manager, Employment as defined and classified in the Dictionary of Occupational Titles." (AR at HH 0116; 0428).  The report finds that Plaintiff's actual occupation has more physical demands than her own occupation in the national economy.  (AR at HH 0428).  While Hilyer's position at Superior Bank might be defined as medium in regards to physical demand requirements, for purposes of determining disability under the Policy, the position is classified as sedentary.[14]

On June 17, 2008, Plaintiff's LTD Benefits were terminated after a determination that Hilyer did not meet the Policy definition of Disabled. (AR at HH 0289-94).  In a letter dated June 17, 2008, Hartford stated that the decision to deny the claim was based on all of the papers contained Plaintiff's file including: (1) LTD application completed by Plaintiff on October 19, 2007; (2) claimant phone interview

---

[14] The Policy defines "Your Occupation" as "your occupation in the general workforce," not "the job you are performing for a specific employer." (AR at HH 0035).

25

completed December 13, 2007; (3) video surveillance of Plaintiffs activities on February 28 and 29, 2008; (4) interview conducted at Plaintiff's home by Hartford Representative, John Welch; (5) medical records received from Dr. James Beretta dated January 15, 2008, through April 15, 2008; (6) medical records from L.J. Fowlkes dated April 11, 2007, through September 29, 2007; (7) medical records received from Dr. Scott Kelley dated August 31, 2007 through April 09, 2008; (8) review of entire claim file by Hartford's Medical Case Manager on May 28, 2008; (9) faxed response from Dr. Beretta dated June 2, 2008, signed and dated May 30, 2008; (10) faxed response from Dr. Fowlkes dated June 09, 2008; (11) faxed response from Dr. Michael Chandler dated June 12, 2008; (12) job description for the position of Employment Administrator (AR at HH 0427); and (13) Occupational Analysis information completed by a Vocational Rehabilitation Clinical Case Manager on May 05, 2008. (AR at HH 0205).

**E.     Plaintiff's Appeal**

The June 17, 2008, letter informing Plaintiff that her LTD Claim was being denied also contained information concerning the internal appeals process at Hartford. (AR at HH 0207).  The letter informed Plaintiff that she had one-hundred-eighty (180) days to notify Hartford in writing of her decision to appeal. (AR at HH 0207).  Along with an appeal letter, Plaintiff was also invited to submit written

26

comments, documents, records, and other information related to her claim to Hartford for consideration on appeal. (AR at HH 0207).

On July 14, 2008, Plaintiff's attorney notified Hartford that Plaintiff was appealing the decision. (AR at HH 0334).  On appeal Plaintiff provided a letter from Dr. Beretta stating, "I concur with the opinions of [the occupational therapist] that Ms. Hilyer is still disabled and unable to return to full time employment even in a sedentary position." (AR at HH 0399).  Plaintiff also provided a Functional Capacity Evaluation (discussed in detail below), medical records from St. Vincent's in Birmingham, and a prescription for Cymbalta by Dr. Barclay. (AR at HH 0105).  The medical records document an outpatient procedure performed by Dr. Beretta. (AR at HH 0401-07).   From the record it appears that Dr. Beretta performed a right ilioninguinal block. (AR at HH 0402).

In addition to the information provided on appeal by Plaintiff, Defendant also sought and obtained review of the record by two independent doctors, Dr. Kaplan and Dr. Yusah. (AR at HH 0312-22).

**1.    Review of Claim file by Doctors Richard Kaplan and Darwish Yusah**

On January 6, 2009, Doctors Kaplan and Yusah completed Advisory Reports

at the request of Hartford.[15] (AR at HH 0312-22).  Doctor Kaplan reviewed the records from a pain management perspective and Dr. Yusah reviewed the records from a gynecological perspective. (AR at HH 0312; 0322).  After reviewing the record and consulting with each other, Doctors Kaplan and Yusah "agreed that there was neither a pain-related diagnoses nor an OB/GYN diagnosis which is supported by the available medical records. [They] concurred that based on the available medical records, there are no specific restrictions or limitations or impairments which can be established." (AR at HH 0322).

Doctor Kaplan, who is Board Certified in Physical Medicine and Pain Management, reviewed the numerous documents sent to him by Hartford. (See AR at HH 0314-17 for a complete list.)  He reviewed the records regarding Plaintiff's functional capacity for work as of June 17, 2008, and reviewed any changes from June 2008 until January 2009. (AR at HH 0312).  He also reviewed the surveillance video provided by Hartford. (AR at HH 0312).  In particular, Dr. Kaplan noted that Dr. Beretta's office notes provided only minimal information, although it did appear that Plaintiff had been extensively evaluated regarding her pelvic pain of unknown

---

[15] The report is incorrectly dated January 6, 2008. The Summary Detail Report provided by Hartford indicates the Advisory Report was received on January 13, 2009. (AR at HH 0102). Further, the report indicates that the Doctors reviewed documentation that was generated after January 2008. For example, the review included the surveillance video that was taken in February 2008. (AR at HH 0314).

etiology. (AR at HH 0313).

## 2.    Functional Capacity Evaluation

On September 25, 2008, a Functional Capacity Evaluation ("FCE") was conducted on Plaintiff by Bledsoe Occupational Therapy, Inc. (AR at HH 0351-0354). The final report of this evaluation noted that Plaintiff's lifting level was "sedentary/light" and that her working level was "less than sedentary." (AR at HH 0351). The report stated that "[p]atient does have some capacity restrictions, but majority are issues of tolerance (fatigue and pain)." (Id.) Additionally, the evaluator found that "[p]atient began FCE with full efforts and maximum participation, but had a rapid increase in symptoms from the increased activity. There were no overt signs of symptom magnification or embellishment of symptoms to suggest that the patient was not giving her best efforts." (Id.) The report acknowledges that "[s]ome weight must be applied to the subjective statements of patients. Her subjective reports and the MD validating objective pain via the prescribed medications, suggest she is reliable." (Id.) The evaluator opined that "patient did not demonstrate the ability to sustain consecutive days work at the sedentary level." (Id.)

After reviewing the additional evidence, Hartford informed Plaintiff, by letter dated January 13, 2009, that it had completed its review on appeal and was upholding its decision that Plaintiff was not disabled as defined in the Policy and is "capable of

full time sedentary work," including her own sedentary occupation. (AR at HH 0067-69). Hartford advised that this was its final decision and that Plaintiff's claim was closed. On April 29, 2009, Hilyer filed the instant lawsuit. (Doc. # 1).

## IV.   DISCUSSION

## A.   ERISA Standard of Review

The first question the court must answer in addressing the motion for summary judgment is what standard of review applies. In <u>Williams v. BellSouth Telecomms., Inc.</u>, 373 F.3d 1132, 1138 (11th Cir. 2004), <u>overruled on other grounds by</u> <u>Doyle v. Liberty Life Assurance Co. of Boston</u>, 542 F.3d 1352 (11th Cir. 2008), the Eleventh Circuit set forth a six-step model for use in judicially reviewing ERISA denials:

(1)   Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)   If the administrator's decision is in fact "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)   If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

30

(5)     If there is no conflict, then end the inquiry and affirm the decision.

(6)     If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Williams, 373 F.3d at 1138 (footnotes and internal citations omitted).

The final step of this model was called into question by the Supreme Court in Metropolitan Life Inc. Co. v. Glenn, 554 U.S. 105 (2008).  In Glenn, the Supreme Court found that a heightened arbitrary and capricious standard of review is the wrong standard to use when there is a conflict. Id. at 117.  Rather, the Supreme Court held that "a reviewing court should consider [the] conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." Id.  In Doyle, the Eleventh Circuit recognized that Glenn overruled the application of the heightened standard to a conflicted administrator's benefits decision. 542 F.3d at 1360.  The Doyle court held that "while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." Id.  Even though the standard of review for the final step enumerated in Williams has changed, the "methodology remains intact." Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1196 (11th Cir. 2010).  Accordingly, this court will begin with

a *de novo* review of Hartford's decision. If this court finds that Hartford's decision was wrong, then this court will review whether the decision was reasonable, taking any possible conflict into account as a factor.

**B.    Was Hartford's Decision Denying Benefits Wrong When Reviewed on a *De Novo* Basis?**

The court's initial task is to review, on a *de novo* basis, whether the decision to deny Hilyer's claim for long term disability was wrong.  In determining whether the decision was wrong, "the court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." Glazer v. Reliance Std. Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).  A decision is wrong if "the court disagrees with the administrator's decision." Id.  If the court determines that the administrator's decision is right, then summary judgment is due to be granted in favor of Hartford. Id.

In determining whether Hartford was wrong in denying Hilyer's claim for LTD benefits, this court begins with a review of the Policy itself, since an ERISA plan administrator must discharge its duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]". 29 U.S.C. § 1104(a)(1).[16]

---

[16] Under the terms of the Policy at issue,, a person is eligible for LTD benefits if: "1. [they] become Disabled while insured under this plan; 2. [they] are Disabled throughout the

In other words, for there to be a finding that Plaintiff is disabled as defined by the policy, Plaintiff must show that she is unable to perform one of more of the essential duties of her occupation, as it is defined in general workplace. In this case, Hilyer's occupation is defined as "Manager, Employment," which is a sedentary job. (AR at 0428). Plaintiff does not meet her burden.

Plaintiff's own assertions concerning her abilities, combined with the video, which she admits is representative of her functionality, is sufficient to establish that Plaintiff is able to perform the essential duties of a full-time sedentary job. In her initial interview with the Hartford Claim Examiner, Hilyer stated that she was able to perform pretty much any activity, but has to do it with pain. (AR at HH 0140). She stated that she had to stop work due to pelvic pain that she could no longer tolerate. (Id.) Hilyer later told a claim manager that at the time she left work, she felt the pain

---

Elimination Period; 3. [they] remain Disabled beyond the Elimination Period; 4. [they] are, and have been during the Elimination Period, under the Regular Care of a Physician; and 5. [they] submit Proof of Loss satisfactory to [Hartford]." (AR at HH 0020). The term "Disability or Disabled" is defined in the Policy, in relevant part, as follows:

Disability or Disabled means:
1.    that during the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation;
2.    for the 24 months following the Elimination Period, you are prevented from performing one or more of the Essential Duties of Your Occupation

(AR at HH 0032). "Your Occupation" is defined as "your occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job you are performing for a specific employer or at a specific location." (AR at HH 0035).

medication was making it difficult to function, but was not decreasing her pain. (AR at HH 0125). As evidenced by the above statements, Plaintiff had several reasons for stopping work, yet none of the reasons explain why she is unable to work full time in a sedentary job. She admits that she is able to perform most tasks, and given her self-described limitations, discussed in detail below, she is able to perform all the essential duties required for a sedentary position. Her complaint concerning her ability to function while on pain medication is also contradicted by her very actions that were captured on the surveillance footage.

In an in-person interview conducted at Plaintiff's home, Plaintiff stated that there were times where here pain was so severe that she was unable to get out of bed. (AR at HH 1060). She reported that her pain limited her to her bed about twice a month, on average. (Id.) When asked about her maximum level of functionality she reported the following: (1) she is able to walk a maximum of 20-30 minutes, generally long enough to take care of daily activities such as running errands and going to appointments; (2) she is able to stand for 10-15 minutes; (3) she is able to carry a maximum of 10-12 pounds; (4) she is able to bend forward, twist at the waist, squat, and kneel on the ground; (5) she is able to push and pull something that offers light resistance; (6) she is able to reach without restriction; (7) she is able to walk up and down stairs (not repeatedly); (8) she is able to write or type for as long as she is

able to sit; (8) she is able to sit for 30-45 minutes at a time; and (9) she is able to drive a maximum of 30-45 minutes before needing to get out of the car to stretch and change positions. (AR at HH 1063-64). There does not appear to be anything in these self-reported limitations that would prohibit Plaintiff from working full time in a sedentary job. Plaintiff indicated that she is able to type for as long as she is able to sit, which is a maximum of 30-45 minutes. If this limitation meant that Plaintiff was only able to be seated for 30-45 minutes a day, it would certainly limit her ability to perform a sedentary job. However, the surveillance video captured of Plaintiff shows that this is not the case. In the video, Plaintiff was seen eating at a restaurant for a total of ninety-six minutes. (AR at HH Disks 1-3). Although Plaintiff did not remain seated for the entire meal, she was seated for the vast majority of the dinner without any outward signs of discomfort. Further, Plaintiff was able to return to sitting after the quick breaks that she did take indicating an ability to sit for long periods of time so long as she was able to take quick breaks as necessary. Plaintiff also states that she is limited by the effects of her prescription medication. However, this assertion is undermined not only by the video footage, but by Plaintiff's own assertions that the video footage accurately represents her abilities. (AR at HH 1065). Plaintiff states that her driving is limited by the pain medication she is prescribed. (AR at HH 1064). Yet, the surveillance video depicts Plaintiff driving not only herself, but a friend

around town on both days footage was taken. Given that driving a car is a dangerous activity that requires the utmost focus, Plaintiff's choice to get behind the wheel belies her assertion that the pain medication inhibits her ability to function, especially with respect to driving.

Plaintiff argues that the video does nothing to discredit her or her disability and that there is nothing in the video that shows her engaged in an activity or combination of activities that demonstrates she is not disabled. Having viewed the video, the court finds that the video speaks for itself. There are, in fact, discrepancies between Plaintiff's reported limitations and her actions on the video. For example, Plaintiff reports that she needs to use the railing when walking up and down stairs, yet, in the video she is shown walking up stairs without using the railing. (AR at 1062). However, it is not Plaintiff's ability or inability to perform individual tasks, such as climbing the stairs without using the railing, that is telling, but rather Plaintiff's actions on the days surveillance was taken as a whole. On both days, Plaintiff was out of the house dining and shopping for at least two and a half hours at a time.[17] (AR at HH Disk 1-4). Her ability to be out of the house and active for this amount of time, regardless of her need to take short breaks, shows she is able to perform the duties of

_____

[17] On February 28, 2008, Plaintiff is shown leaving a friends house at 3:08 p.m.. The investigator captures video of Plaintiff's activities until 5:38 p.m.. On February 29, 2008, Plaintiff leaves her house at 12:51 p.m. and remains out of the house until at least 3:34 p.m..

a sedentary position.

Plaintiff also takes issue with differences between the video and the description of the video contained in Hartford's reports and in its letters to some of Plaintiff's physicians. The court notes that while Defendant's characterizations of the video in the record are not entirely accurate, those inaccuracies are not such that they are overly misleading. With respect to summaries of the video included in letters to Plaintiff's doctors (both Plaintiff's attending physicians and the independent physicians hired to review the record on appeal), Defendant also sent copies of the video in its unedited form to those doctors in the same package as the letter. (AR at HH 0115; 0314). Further, Dr. Kaplan indicates in his report that he reviewed the video and, as such, his report is based on that viewing and not Defendant's summary of what occurred. (AR at HH 0314).

Even assuming Plaintiff's activities and self-reported limitations did not disprove a disability, she still does not provide sufficient medical evidence to establish that she is disabled. Plaintiff argues that nowhere in her medical records do her physicians question whether she is actually in pain. (Doc. # 32 at 14-17). The court does not doubt that Plaintiff actually experiences pelvic pain. However, the inquiry is not whether Plaintiff is experiencing pain, but rather whether such pain renders her unable to work in a sedentary occupation. It is clear that Plaintiff has

been receiving treatment for her pelvic pain for many years (AR at HH 0755-807). Nevertheless, there is nothing in the record to indicate what happened in July 2007 to render her disabled.  In fact, Plaintiff was able to work for seven years while undergoing similar medical problems. (Id.)  This is the very issue that plagued Hartford's claim managers. They repeatedly point to the fact that there is nothing in the medical records to indicate what changed in Plaintiff's medical condition to render her disabled. (AR at HH 0115; 0120-22; 0125-26; 0130).  Neither Plaintiff nor her volumes of medical records provide an explanation as to what changed in July 2007 to make her unable to perform the duties of her occupation.[18]

The medical records and reports provided by Plaintiff contain conflicting opinions among her treating physicians.  On one hand, Dr. Fowlkes, Plaintiff's gynecologist and the doctor with whom she has the longest relationship, indicated that he is uncertain of the cause of Plaintiff's problems; he stated in a report to Hartford that Hilyer does not have endometriosis and had not been evaluated for lesions since 2005.  (AR at HH 0683; 0671).  Additionally, he opined that Plaintiff did have physical ability to work full time in a sedentary position.  (AR at HH 0527-

---

[18] In fact, there is evidence in Plaintiff's medical records that indicates Plaintiff's pain was under control at the time she stopped working. During a visit to Birmingham Pain Clinic three days after her last day of work, Plaintiff reported that her pain was mostly controlled. (AR at HH 0953).

30).  On the other hand, Dr. Kelley indicated that Plaintiff did have endometriosis and pelvic adhesions.  (AR at HH 0724).  Further, there is dispute among Plaintiff's physicians over whether Hilyer is able to work in a sedentary occupation: Dr. Fowlkes thinks she is able; Dr. Beretta initially responded that she was able, but later changed his mind; and Dr. Chandler, who only saw Plaintiff once, stated that he disagreed with Dr. Fowlkes and Dr. Beretta's assertion that Hilyer was able to perform the functions of a full-time sedentary occupation.

Given the discrepancy among Plaintiff's treating physicians, Defendant was wise in having two independent physicians review Plaintiff's file.  This review was conducted by Dr. Kaplan, a pain management specialist, and Dr. Yusah, a gynecologist.  After reviewing the administrative record, including medical records, surveillance video, and statements from the Plaintiff, as well as conferring with Dr. Beretta, both doctors "concurred that based on the available medical records, there are no specific restrictions or limitations or impairments which can be established."  (AR at HH 0322).

On appeal Plaintiff submitted additional documents to Hartford. (AR at HH 0104-05).  Plaintiff argues that these documents are sufficient to establish her disability.  One such document submitted by Plaintiff is a FCE given by an occupational therapist.  The report found that Plaintiff's working level was less than

39

sedentary. (AR at HH 0373).  In the report the therapist notes that, "[p]atient does have some capacity restrictions, but majority are issues of tolerance (fatigue and pain)." (Id.)  He further notes that "[s]ome weight must be applied to the subjective statements of patients." (Id.)  This is especially true considering that findings of fatigue and pain are based on Plaintiff's subjective reports to the therapist.  Defendant argues that because of the subjective nature of the evaluation, it is wholly insufficient to establish Plaintiff's disability. Defendant points to Dr. Kaplan, who noted that, the FCE "did not contain objective measures of internal reliability and consistency such as statistical analysis or correlation of pain with vital signs" and instead "largely relied upon evaluator's subjective impression that claimant's reported subjective limitation reflected her maximum work ability." (AR at 318).  In Thomas v. Hartford Life & Accident Ins. Co., the court found that an FCE did "not save Plaintiff's claims for LTD benefits," in part because "the FCE was not based on any restrictions or limitations by a medical professional.  Rather, the report was based primarily on Plaintiff's subjective complaints to the examiner." 1:09-CV-0877-CC (N.D. Ga. Mar. 29, 2010).  Like in Thomas, Plaintiff's FCE will not save her claim for LTD benefits. The evaluation is merely one piece of evidence contained in the record.  Because of its subjective nature, it is not enough to overcome the numerous pieces of evidence indicating that Plaintiff is able to work in a sedentary position.

40

In addition to the FCE, Plaintiff also submitted a letter from Dr. Beretta stating he agreed with the finding from the FCE that Plaintiff's working level was less than sedentary. Disregarding the conclusory statement and subjective basis of his opinion (the FCE), this letter solely serves to negate his previous report that Plaintiff was capable of performing sedentary work.  Finally, Plaintiff submitted records from St. Vincent's Hospital and a copy of a prescription. These documents simply supplement the existing medical records.  They do not provide any additional information as to Plaintiff's disability or potential limitations or restrictions.

When viewed as a whole, the medical records, including the documents submitted on appeal, show that Plaintiff failed to establish that she was disabled. While there are competing opinions with regards to Plaintiff's ability to function in a sedentary job,[19] those opinions that are based on objective medical evidence outweigh those opinions that indicate she is disabled based on her own subjective indications of her abilities.  Further, even if those differing opinions were to be weighed equally, it would raise the question of whether Plaintiff met the burden of proving her disability as required by the Policy.

_____

[19] Contrary to Plaintiff's arguments, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

41

Fortunately for the court, it does not have to make a decision based solely on the medical information contained in the record.  When taken with the medical records, Plaintiff's self-reported limitations and documented activities from the surveillance video indicate that Plaintiff is not disabled as defined by the Policy. Several doctors state that she is able to perform the  essential duties of a sedentary position.  Additionally, Plaintiff admits that she is able to perform most activities, except that she must do so with pain.  The video footage captured in February 2008 shows that Plaintiff is able to get out of the house, run errands, enjoy a ninety-six minute meal with a friend, and go shopping.  These demonstrated abilities, taken in conjunction with the medical opinions of Dr. Fowlkes, Dr. Kaplan, and Dr. Yusah indicate that Plaintiff is able to perform the essential duties of her "own occupation."

Having weighed all the evidence that was in the record before the administrator, the court finds that Hartford was correct in denying Plaintiff's LTD benefits.

## C. Was Hartford's Decision to Deny Benefits Reasonable?

Even if the court assumes, *arguendo*, that Defendant's decision to deny Plaintiff's benefits was wrong, summary judgment is still due to be granted in favor of Defendant because its decision was reasonable.  If a court finds that the administrator was *de novo* wrong when it denied a claimants benefits, Williams and

its progeny require the court to apply an arbitrary and capricious standard to review that decision when that administrator was vested with discretion to determine eligibility for benefits or construe the terms of the plan.  In this case, it is without question that Hartford was vested with such discretion. (AR at HH 0031) ("[Hartford has] full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.").  This fact is agreed to by both parties. <u>See</u> Defendant's Memorandum of Law in Support of its Motion for Summary Judgment (Doc. # 22 at 18) ("[T]he policy vests Hartford with the discretionary authority to construe Plan terms and determine eligibility for benefits."); Plaintiff's Reply to the Defendant's Motion for Summary Judgment (Doc. # 32 at 8) ("In the instant case, Hartford has confessed that it has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.").  Additionally, Plaintiff's response solely addresses whether Defendant acted arbitrarily and capriciously when denying Plaintiff's claim for LTD benefits. (Doc. # 32)  Accordingly, assuming, for the sake of argument, that Hartford's decision to deny Plaintiffs LTD benefits was wrong, the next step is to determine whether such decision was reasonable.

Under arbitrary and capricious review, "the plan administrator's decision to deny benefits must be upheld so long as there is a 'reasonable basis' for the decision."

Oliver v. Coca-Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007), reh'g granted and partially vacated on other grounds, 506 F.3d 1316 (11th Cir. 2007), quoting Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1140 (11th Cir. 1989).  That is, "this Court's role is limited to determining whether [Hartford's] interpretation was made rationally and in good faith – not whether it was right."  Guy v. Southeastern Iron Workers Welfare Fund, 877 F.2d 37, 38 (11th Cir. 1989).  The determination of the plan administrator "need not be the best possible decision only one with a rational justification."  Griffis v. Delta Family-Care Disability Plan, 723 F.2d 822, 825 (11th Cir. 1984).

If a reasonable basis exists for the decision made by Hartford, "it must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision."  Jett v. Blue Cross & Blue Shield, Inc., 890 F.2d 1137, 1138 (11th Cir. 1989); see also Sharron v. Amalgamated Ins. Agency Servs., Inc., 704 F.2d 562, 564 (11th Cir. 1983) ("[A] court should enforce a decision of pension fund trustees even though the court may disagree with it, so long as the decision is not arbitrary and capricious.").  "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  Davis v. Kentucky Fin. Cos. Retirement Plans, 887 F.2d 689, 693 (6th Cir. 1989), quoting Pokratz v. Jones Dairy Farm, 771 F.2d 206, 209 (7th Cir. 1985).

44

Under <u>Glenn</u> and <u>Doyle</u>, this court to is to consider Hartford's conflict of interest as a factor in the arbitrary and capricious analysis.[20] <u>Doyle v. Liberty Life Assur. Co.</u>, 542 F.3d 1352, 1360 (11th Cir. 2008). In other words, a conflict of interest is one of several considerations that a court should take into account when considering the lawfulness of a denial of benefits. <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 117 (2008). Further, "[w]hile the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show that the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." <u>Doyle</u>, 542 F.3d at 1360.

Plaintiff asserts that Defendant acted unreasonably in two ways: by dismissing the opinions of Plaintiff's treating physicians and by refusing to address potentially dispositive issues of fact.

The court first turns first to Plaintiff's argument that Defendant unreasonably dismissed the opinions of Plaintiff's treating physicians. Plaintiff argues that "Hartford arbitrarily dismissed the opinions of [the] physicians who have treated Hilyer for years, who have physically examined her, who have seen first-hand

---

[20] Hartford admits that because it both insures benefits and administers claims under the Policy, it is presumed to operate under a conflict of interest. (Doc. # 22 at 18).

Hilyer's disability and the effect it has had on her." (Doc. # 32 at 16). However, this
is simply untrue. Defendant repeatedly contacted Hilyer's treating physicians to
collect their medical records and treatment notes in order to gain their information
and viewpoints as to her disability. (AR at HH 0085-90; 0667-68; 0671-72). In fact,
Defendant specifically addressed the findings from Dr. Beretta, Dr. Fowlkes, and Dr.
Chandler in both its initial benefits termination letter and appeal denial letter. (AR at
HH 0067-69; 0079-83). Further, Defendant specifically relied on Dr. Fowlkes's
opinion, the doctor with whom Plaintiff had the longest standing relationship, when
deciding whether to terminate Plaintiff's benefits. (AR at HH 0068) (noting that Dr.
Fowlkes stated that Plaintiff was capable of full time sedentary work).

To the extent that Plaintiff argues that Defendant was unreasonable because it
placed greater emphasis on the medical reports suggesting Plaintiff could perform the
duties of her own occupation than those that stated she could not, the Eleventh Circuit
has found otherwise. In Doyle, the Eleventh Circuit stated that "we do not
believe . . . that [Defendant's] preference for medical opinions grounded on objective
medical evidence is somehow indicative that its decision was unreasonable." 542
F.3d at 1362-63. This is precisely what Defendant has done. It has placed greater
emphasis on those reports that are grounded in objective medical evidence than those
based on the subjective reports of the Plaintiff. Defendant relies on the objective

46

medical evidence shown in Plaintiff's medical records and interpreted by not only Dr. Fowlkes, but by its independent physicians who found that "there was neither a pain-related diagnosis nor an OB/GYN diagnosis which is supported by the available medical records." (AR at HH 0322). This coincides with Dr. Fowlkes's findings that Plaintiff's pain is of unknown etiology and that she is able to perform the duties of a sedentary job. (AR at HH 0527-30; 0671-72). Those reports that are more subjective, such as the FCE, which acknowledges that "some weight must be applied to the subjective statements of patients," are given less credence than those that are objective. (AR at HH 351). Accordingly, Hartford's reliance on those reports that are objective is reasonable.[21]

The crux of Plaintiff's second argument – that Defendant refused to address potentially dispositive issues of fact – is that neither of Defendant's independent physicians addressed restrictions caused by Hilyer's prescription regimen and that Defendant failed to contact Plaintiff's employer regarding its observations of her limitations. However, both of these arguments must fail.

The fact that neither of the independent physicians addressed restrictions

---

[21] Further, to the extent that Defendant did dismiss the reports of treating physicians in favor of the reports of non-treating physicians, there is nothing in the law that requires Defendant to give greater weight to the opinion of Plaintiff's treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (noting that a plan administrator has no obligation to give a treating physician's opinion more weight).

caused by Plaintiff's prescription regimen is inapposite.  Plaintiff's prescriptions for pain medication do not, in and of themselves, suggest a disability, nor do her own physicians provide any limitations or restrictions based on the pain medications mentioned in her records.[22]  Further, despite Plaintiff's initial assertions that the pain medication was making it difficult to function, (see AR at HH 0125), the surveillance video later depicts her driving not only herself, but a friend around town.  This activity seems to undermine her assertion that the medications made it difficult for Plaintiff to function.  The records shows that Plaintiff's counsel mentioned that Hilyer was taking medications that may affect her ability to work in a letter to Hartford dated November 12, 2008. (AR at HH 0344-50).  However, this assertion is not supported by any medical records already in Hartford's file nor does he include any additional medical records to support this claim.  Plaintiff bears the burden of proving she was disabled.  As such, if Plaintiff's prescription regimen limited her ability to work it was her responsibility to submit proof supporting that claim. It is not sufficient to simply state that she had been prescribed pain medication.  The failure of Defendant's independent physicians to address potential limitations caused by Plaintiff's

---

[22] Dr. Kelley's Attending Physician Statement, dated October 18, 2007, indicates that Hilyer is unable to drive or use a keyboard secondary to medication. (AR at HH 0724). However, Plaintiff contradicts this in her later statement to John Welch when she says that she is able to drive and type for as long as she is able to sit. (AR at HH 1063-64).

prescription regimen was not unreasonable, especially considering this fact was not even addressed by her own doctors. Even if it were unreasonable to give credence to the report of Doctors Yusah and Kaplan, in light of their failure to address the potential effects of Plaintiff's prescriptions, between the reports of Plaintiff's physicians, the surveillance video, and Plaintiff's own statements,  the record still contains sufficient evidence to justify a denial of benefits.

Plaintiff acknowledges that it was her obligation under the terms of the policy to present evidence to establish her disability.  Yet, in the same breath she argues that Defendant acted unreasonably in not seeking out information from her employer on its own.  The policy is clear in its requirement that Plaintiff provide Proof of Loss to establish her disability. (AR at HH 0020) ("You will be paid a monthly benefit if . . . [y]ou submit Proof of Loss satisfactory to us.").  As such, it was not unreasonable for Hartford to fail to independently seek out such information.

Plaintiff seems to rely on the fact that her attorney requested that Defendant contact Superior Bank.  However, if she thought this information was crucial to a decision concerning her benefits, it was her responsibility, not Defendant's, to ensure that this evidence was part of the record on appeal. There was nothing preventing Plaintiff from seeking an affidavit from her employer and submitting it to Hartford to consider on appeal. Because it was under no duty to collect such information, the

failure on Defendants's part to consult with Plaintiff's employer concerning her limitations was not unreasonable.

Finally, the conflict created by Defendant's dual role as claims administrator and insurer has little bearing on the reasonableness of its decision. Plaintiff does not offer any evidence to suggest that this dual role had any effect on Defendant's decision to deny her benefits.[23]   Additionally, there is nothing in the record suggesting "a higher likelihood that [the conflict] affected [Defendant's] benefits decision," such as "a history of biased claims administration." Glenn, 554 U.S. at 117.

Defendant's decision to deny Plaintiff's LTD benefits was supported by the medical records and reports of Plaintiff's attending physician, Dr. Fowlkes; the surveillance video; Plaintiff's own reports of her abilities; and the independent peer review conducted by Doctors Kaplan and Yusah. Given this evidentiary support and

---

[23] The only possible reference to the impact of a conflict of interest in Plaintiff's brief is the statement that "[t]he timing [of a notation indicating a review of the decision concerning benefits] raises serious questions regarding the objectiveness of Hartford in reviewing the application." Plaintiff further commented on the fact that the award of benefits was nearly simultaneous with the termination of benefits. (Doc. 32 at 4). However, the amount of time between the final approval of benefits and the decision to review the file, does not indicate a lack of objectivity on Defendant's part. Defendant was clear at the time of approval that the file would likely be reviewed. The notation suggesting approval stated that Defendant was to follow up on the file in three months. (AR at HH 0125). A fact that was communicated to Plaintiff when she was notified via phone of the approval of her claim. (AR at HH 0123) ("[d]iscussed ongoing proof of disability requirements. Explained that we would likely be updat[ing] her medical records in [three months] to determine her progress"). While the review did begin sooner, the fact that at the time of her approval, Defendant planned to review the decision indicates that this decision did not stem from a conflict of interest.

the lack of any evidence indicating that their decision was tainted by a conflict of interest, the court finds that Defendant's decision to deny Plaintiff's benefits was reasonable.

## V.   CONCLUSION

For the reasons asserted above, the motion (Doc. # 21) for summary judgment is due to be granted.  A separate order will be entered.

**DONE** this the ____31st____ day of January, 2011.

_____

SENIOR UNITED STATES DISTRICT JUDGE